THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v JUAN SERRANO, Defendant.

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v AFZAL HOSEIN, Defendant.

Criminal Court of the City of New York, Kings County, February 24, 1989

**APPEARANCES OF COUNSEL**

*Robert M. Baum* and *Deborah L. Siner* for Juan Serrano,

defendant. *Gary Cohen* for Afzal Hosein, defendant. *Elizabeth Holtzman, District Attorney (Donald Berk* of counsel), for plaintiff.

## OPINION OF THE COURT

JOSEPH KEVIN McKAY, J.

### INTRODUCTION

Defendants are each charged with violating Vehicle and Traffic Law § 1192 (2), the intoxicated driving statute, and related counts. They have moved separately on papers—consolidated for purposes of this motion and hearing only—for suppression or preclusion of the breathalyzer results before trial on grounds that certain chemical products (ampoules and simulator solutions) used in the breathalyzer machine (the Smith & Wesson Model 900A) to test their blood alcohol content (BAC) cannot be shown to have been scientifically reliable. Armed with an investigative report from the Auditor General of the Commonwealth of Pennsylvania highly critical of Systems Innovation, Inc. (SII), the supplier of these products, defendants attacked the professionalism and scientific reliability of the entire SII operation and the products it manufactured from 1986 until early 1988.

The District Attorney cross-moved to preclude any use at trial of the Auditor General's report and submitted a letter from the Pennsylvania Attorney General's Office which summarized his separate investigation and refuted many of the Auditor General's findings and conclusions. The battlelines having been drawn, the court ordered a pretrial evidentiary hearing to be held, modeled to some extent on CPL 710.60, but mindful that this was not strictly a statutory or constitutional suppression hearing. It was one designed to make an *in limine* evidentiary ruling as a matter of law on the admissibility of the controversial documents relating to the breathalyzer products supplied by SII and their impact on the admissibility of the breathalyzer test results obtained in these cases.[1]

---

1. Several other trial courts in New York State have entertained similar motions: one ordered a hearing *(People v Pantaleo,* 141 Misc 2d 251 [Crim Ct, NY County]), another summarily denied defendant's motion *(People v Close,* NYLJ, Jan. 26, 1989, at 24, col 4 [Crim Ct, NY County]), a third ordered a hearing to be held within a vehicular manslaughter trial *(People v Gatto,* NYLJ, Feb. 9, 1989, at 24, col 6 [Sup Ct, Bronx County]), and a fourth court denied defendant's motion after an extensive hearing *(People v Urquhart,* Rochester City Ct, Jan. 23, 1989, Walz, J.).

## BACKGROUND

It is now well settled that the breathalyzer is a scientifically reliable instrument which, assuming certain conditions are met, is capable of producing an accurate measurement of a suspect's BAC. *(People v Alvarez,* 70 NY2d 375, 380 [1987]; *People v Mertz,* 68 NY2d 136, 148 [1986]; *People v Freeland,* 68 NY2d 699 [1986]; *People v Gower,* 42 NY2d 117 [1977]; *People v Donaldson,* 36 AD2d 37 [4th Dept 1971].)[2] Articulated in general terms, the necessary conditions are that the machine must be properly calibrated and in good working order, that the chemicals used must be of the proper kind and mixed in the proper proportions,[3] and finally that the machine must be operated properly during the test. *(People v Freeland, supra; People v Donaldson, supra.)*

The Smith & Wesson Model 900A breathalyzer uses a photometric system which traps a measured sample of deep lung air from the suspect's breath and runs that sample through a 3-millileter chemical solution (50% sulphuric acid in water, .25 mg/ml potassium dichromate and silver nitrate, a catalyst) contained in a small glass test ampoule. The reaction in the test ampoule causes a light-sensitive meter to move proportionately, thereby producing a result which the previously calibrated machine converts from an air-alcohol measurement into a BAC reading by a fixed scientific ratio. These ampoules are ordered from the manufacturer, SII, by the New York City Police Department in large quantities and at regular intervals.[4] A major issue at this hearing was the integrity of the chemical solution in these ampoules, which

2. A relatively new challenge to the scientific premise underlying the breathalyzer has recently been made, which may cause a reconsideration of these precedents in the future. *(See, State of New Jersey v Downie,* 229 NJ Super 207, 550 A2d 1313 [App Div 1988]; *State v Burling,* 224 Neb 725, 400 NW2d 872 [1987]; *People v Pritchard,* 162 Cal App 3d 13, 209 Cal Rptr 314 [1984].)* Modern research and statistics have been cited to question the validity of the 1 : 2100 air to blood ratio as it is applied without variation to the general population. Such a challenge has recently been made in *People v Serrano,* the resolution of which is for another day.

3. Typically, the prosecution lays a foundation for introducing the results of the breathalyzer test by, *inter alia,* offering as business records certificates of analysis of sample products—ampoules and simulator solutions—from the same *lot* as those used in the specific case on trial, to prove that those products met the required specifications. The defendants' motion challenges that procedure for reasons developed at the hearing.

4. Detective Joseph Bonamo, an IDTU technical supervisor at the New York Police Department Laboratory, orders ampoules and simulator solu-

are vital to the integrity and reliability of the breathalyzer testing procedures and its results.

The other product received from SII and used in these cases is called the simulator solution.[5] It is supposed to be a .10% solution of alcohol in water, which is used to create a vapor to test the accuracy of the machine before the suspect's breath is actually tested. The same solution is also used as a maintenance device to calibrate the machine periodically.

### SCOPE OF HEARING

Given the nature of this hearing, the rules of evidence were relaxed and hearsay was admitted. (See, CPL 710.60 [4]; *People v Hughes,* 59 NY2d 523, 547 [1983] [pretrial hearing to test reliability of a hypnotized witness]; *see also, People v Gatto,* NYLJ, Feb. 9, 1989, at 24, col 6; McCormick, Evidence § 53, at 135-139 [Cleary 3d ed].) Both the report of the Auditor General and the Attorney General's response were received into evidence and the parties were given a full opportunity to enlarge their record with live testimony, affidavits, additional exhibits, and transcripts of the testimony of witnesses who had recently testified for the defense or the prosecution in a nearly identical hearing held in an upstate court.[6]

### THE RECORD

#### *Auditor General's Report*

While starting as a routine inquiry into a complaint from a disgruntled consultant of an SII subsidiary, the Auditor General's investigation was expanded and lasted for 10 months from March to December 1987. Based on interviews, on-site inspections and review of records, the Auditor General genera-

---

tions directly from SII for the entire city but only from lots pretested and approved by the New York State Police Laboratory. He ordered 5,000 ampoules at a time approximately every six months from SII for the past three years.

5. Detective Bonamo orders simulator solution from SII in quantities of 50 or 100 bottles every few months, because of its relatively short life. SII, which has been New York City's supplier of simulator solution only since January 1988, produced lot 1027 which was used in the tests of both defendants.

6. It does not appear that either side attempted to use the wide-ranging subpoena powers of CPL 610.20 and 640.10 (3). However, the transcripts of two former SII employees who testified in the Rochester *People v Urquhart* hearing were submitted, one by the defense and one by the prosecution.

ted a report which criticized virtually every facet of SII's operation.

Generally, it found an unprofessional "laboratory" lacking adequate record keeping and quality controls. With respect to the simulator solution, the report found that SII used water which was filtered, not distilled, and used 190 proof grain alcohol, not 200 proof U.S.P. certified reagent grade alcohol, which deviated from the contract SII had with the Commonwealth.

The report was concerned only incidentally with ampoule production because most of the Pennsylvania law enforcement agencies use different machines and SII markets few ampoules within Pennsylvania. It did include criticism of SII's sealing and labeling process for ampoules, but the factual issue concerning the type of mixing process used, which became central in this hearing, appears to have escaped the investigators' attention.

### The Pennsylvania Attorney General's Response

The Attorney General's response took issue with the conclusions of the Auditor General's report and questioned its impartiality, completeness and accuracy in many respects. He noted internal inconsistencies and, citing independent experts, argued that the report exaggerated SII's problems.[7]

The remainder of the record developed at this hearing consisted of numerous selected exhibits from the Appendix to the Auditor General's report, the live testimony of a State Police sergeant from the Traffic Section of Division Headquarters in Albany, the director of the New York State Police Laboratory and a detective supervisor from the New York City Police Laboratory, as well as the transcripts of the testimony of two former SII employees.[8]

#### STANDARD AND BURDEN OF PROOF

In a typical Fourth Amendment suppression case the People

---

7. Remarkably lacking in this refutation, however, and in the District Attorney's case in this proceeding, was any documented, convincing description of SII's professional production methods, quality controls or business record keeping.

8. William Fies, the actual mixer of the solution, was not heard from at all. He lacked education, training and prior experience as a chemist. Whether or not he was "available" to the District Attorney, he surely was under SII's control, and his silence must weigh against the prosecution.

must come forward to show the legality of the police conduct and then the burden shifts to the defense to prove illegality by a preponderance of the evidence in order to exclude otherwise *competent* evidence because of a constitutional violation. *(People v Berrios,* 28 NY2d 361, 367 [1971].)

Since this proceeding, unlike *Berrios (supra),* is not a typical suppression case, those rules should not apply.[9] Here the defense has put in issue the reliability and *competence* of a necessary part of the People's own case and it would therefore seem only fair and logical to place the burden of proof upon the prosecution, not the defense. *(See, People v Hughes, supra; see also, People v Sesman,* 137 Misc 2d 676, 681-683 [Crim Ct, Bronx County 1987].)[10] Moreover, the Court of Appeals most recent pronouncement on this issue expressly left open what degree, nature and quality of proof would be required to admit breathalyzer results into evidence, but never suggested that the burden would be shifted to the defense. *(People v Freeland, supra; see also, People v Alvarez, supra; People v Gower, supra.)*

Accordingly, in analyzing the evidentiary record herein and in determining the outcome, I will require the defense to bear the burden of coming forward initially with proof of the unreliability of SII's controversial products. If that occurs, the burden of proof will then shift to the prosecution to establish admissibility by at least a preponderance of the credible evidence,[11] recognizing that insofar as the breathalyzer results

---

9. *Compare, People v Pantaleo* (141 Misc 2d 251) and *People v Urquhart* (Rochester City Ct, Jan. 23, 1989, Walz, J.), wherein the ultimate burden in similar hearings was placed upon the defense.

10. In my view the court in *People v Sesman* (137 Misc 2d 676) went too far in requiring of the prosecution proof beyond reasonable doubt at a pretrial hearing on the issue of the two-hour time limit within which the breathalyzer must be administered after arrest, nor will I hold the People to that burden at this hearing. At the subsequent trial the jury must be charged on the reasonable doubt standard for each element of the case, but I know of no authority or necessity for removing that issue from the jury if there was sufficient evidence for them to so find. It would be tantamount to creating a new "second bite of the apple" rule, now strictly limited to the unique situation of *Huntley-Miranda. (See, People v Huntley,* 15 NY2d 72, 78 [1965]; *People v Graham,* 55 NY2d 144 [1982]; CPL 710.70 [3]; 60.45.)

11. It may be appropriate to require the People to meet the somewhat higher burden of "clear and convincing evidence," as required in special situations posed by such cases as *People v Whitehurst* (25 NY2d 389 [1969]) (consent searches), *People v Ballott* (20 NY2d 600 [1967]) (independent source in "tainted" identification cases), and *People v Hughes* (59 NY2d 523) (effect of prior hypnosis on testimony of a witness). However, in view of my

(if ever admitted at trial) may form an element of a count in the People's case, the prosecution would ultimately have to establish the reliability of those results beyond reasonable doubt.

### THE ISSUES

I must decide if the certificates of analysis from the New York State Police Laboratory reflecting the chemical integrity of sample ampoules and the simulator solution bearing the same lot numbers as those used to test these defendants have the requisite probative force, assuming the other foundational requirements are met, to permit the breathalyzer test results to be admitted into evidence at trial. *(People v Freeland, supra; People v Donaldson, supra.)* If the defense comes forward with sufficient evidence to question the reliability of those certificates (on grounds that they cannot be shown to be truly *representative* of any others bearing the same lot numbers) and if the prosecution fails to overcome that challenge, then the breathalyzer results cannot be admitted into evidence on the basis of those certificates. If that conclusion is reached, alternative positions of the parties will be explored.

### DISCUSSION AND ANALYSIS

Without exception, every witness, document and expert opinion heard or referenced in this proceeding recognized what logic and common sense dictate: that the scientific integrity and probative value of the analyses performed on the "sample" ampoules and simulator solution depend upon their *representative* character, which in turn depends upon their having been produced from the same batch in the identical vat at the same time and in the identical manner. SII's methods of production during 1986 and 1987 are therefore critical to this case.

Lee Campbell, a former production worker at SII, testified pursuant to defense subpoena in the *Urquhart* Rochester hearing. He explained in vivid detail how he witnessed and participated in the production process of ampoules at SII over a 14-month period from September 1986 to November 1987, which covered production periods for lots 0916 and 0917 used in these cases. Although lacking sophistication, he displayed

---

analysis of the evidence, as discussed later in this opinion, I do not now decide that issue.

an ability to remember and recount consistently and from firsthand knowledge how the chemicals were mixed and the ampoules filled and sealed and then packaged for shipment during that entire period. He was unshaken in his assertion that the ampoules' solutions were always mixed individually in 5-gallon glass jugs and never combined in the larger vessels which were on SII's premises, one 55-gallon drum and one 350-gallon tank, at any point in this process. He testified that the 55-gallon drum, which was used for the simulator solution, was also used to make coffee and kool-aid and to draw drinking water. The largest tank was used for the largest orders of simulator solution. These two tanks were the only large vessels at SII ever mentioned or described by anyone in this record.[12]

In contrast to Mr. Campbell's revelations, there is the transcribed testimony of Michael Dugan submitted by the prosecution. Mr. Dugan, employed by SII from 1982 until January 1988, was production supervisor for SII during periods relevant to these cases. He admits that the 5-gallon glass jugs were regularly used to mix the chemical solution used to fill ampoules, and that this was the only method used in the early 1980's. However, he also claimed that at some unspecified time before 1986 they began to add a new step in the procedure by combining the contents of the 5-gallon jugs of a single lot into a larger vat, the 55-gallon drum, or the 350-gallon container, where they would mix for one or two hours and then be returned back to the 5-gallon jugs to be later drained into 3-milliliter glass ampoules. From this intermingling the prosecution claims that the homogeneity of each ampoule in the lot is assured and the probative value of the certificates of analysis of sample ampoules established. For the reasons given below I have concluded that I cannot accept Dugan's version of the SII ampoule production process.

Dugan had numerous responsibilities at SII, such as over personnel problems, traffic safety devices and new product development, but little day-to-day involvement with the production of the ampoules. He denied that he had any precise knowledge, recollection or access to any records concerning exactly when these lots were mixed and combined. Acknowledging that SII's date code meant that lot 0916 was "theoreti-

---

12. The Auditor General's report, Dugan's own affidavit given to the Auditor General's investigator and, implicitly, the affidavit of SII Vice-President Maurice Dutton, all corroborate Campbell's testimony about the use of those two large tanks for the simulator solution.

cally" prepared in September 1986, he had no explanation for the glaring inconsistency created by the *July* 1986 dates in the certificates of analysis of samples from that same lot.

During relevant periods there were only two large tanks at SII. Moreover, the simulator solution was prepared in greater volume and shipped in much larger containers (500-ml bottles compared to the tiny 3-ml glass ampoules) and could only have been mixed in the two large tanks on the SII premises.[13] I therefore conclude that the two largest containers were used *exclusively* at SII for the simulator solution, and not for the ampoule solution, during 1986 and 1987.

Other evidence and reasonable inferences point to the same conclusion. Using the separate 5-gallon jug method would mean that when a sample taken and sent for certification was rejected, the loss to SII would merely be the one 5-gallon jug of solution, instead of numerous jugs. Also, the combination method would have tied up all of the available 5-gallon jugs at SII during the production of a single large lot until the ampoules were all bottled, a very time-comsuming process at the maximum filling rate of 2,000 bottles per day. Thus, in the case of large lots it would have been impossible for SII to have kept one lot ahead of itself in production, as Dugan repeatedly stated, by the combination method.[14]

This 5-gallon jug method was also easier and safer for SII. Those 3-milliliter ampoule glass vessels could only be filled directly from the 5-gallon jugs because the filling machine— invented by Dugan himself and manufactured locally by SII's own personnel—was able to fill ampoules only from the 5-gallon jugs.[15] It is hard to visualize how these heavy jugs, filled with a very dangerous chemical solution, could have been poured safely into larger containers—a process not described by anyone in this record. Here again Campbell's testimony is far more credible: that when the ampoule solution was mixed

---

**13.** I also accept Campbell's testimony that the 55-gallon container was used for coffee, kool-aid and drinking water, rendering it most unsuitable for mixing the ampoule sulphuric acid solution.

**14.** For lot 0916 this process would have taken five months. Director Horn testified that he was informed by SII that lot 0916 was comprised of 200,000 ampoules. This would have required 32 5-gallon jugs of solution. No one, not even Dugan, ever claimed there were more than 20 or 25 such jugs in existence at SII. Campbell estimated there were only 4 or 5 such jugs.

**15.** One wonders why a filling machine, if it was to be invented and made by SII for its own use, was not made to empty larger containers of the solution directly into the ampoules.

there was a hot and violent reaction and that these 5-gallon glass jugs, full or empty, were so heavy that they were all stored right on the counter near the sealing machine.

### AMPOULE RULINGS

I conclude that during the relevant period SII produced the ampoule mixture *only* in 5-gallon jugs, each of which held enough liquid to fill approximately 6,000 3-milliliter ampoules. While the "chemist" or mixer may have made efforts to use the exact same formula for each of the 5-gallon jugs to meet the same specifications, under current law and acceptable scientific procedures only those ampoules filled from a single vessel of the chemical solution can properly be included in and labeled as part of the *same lot* for sampling and certification purposes. Therefore, the certificates of analysis for lots 0916 and 0917, offered for the *Hosein* and *Serrano* cases by the prosecution, are not competent to prove the integrity or chemical composition of the ampoules used therein.

If SII had maintained adequate records and quality controls, which the proof has failed to establish, then conceivably the SII actual mixer, informed by those records and his personal knowledge and experience, might be able to offer adequate proof of the integrity of the ampoules used in a given case. Since that has not been done in this proceeding after ample opportunity to do so (nor does it appear it could ever be done), the defendants' motions are granted and the prosecution is precluded from introducing the results of the breathalyzer tests of the defendants at trial on the basis of those certificates of analysis.

### SIMULATOR SOLUTION RULING

SII used the less than perfect ingredients of filtered water and 190 proof grain alcohol, which were mixed in either of the two larger tanks and then bottled for shipment in 500-milliliter containers. These ingredients were adequate to produce a good result. Since no one seriously disputes that each and every bottle of a lot was produced at the same time from the same large tank (except arguably for certain lots of different strengths, which were never shipped to New York), I find that the defense did not carry its initial burden of coming forward to challenge the integrity of, or the certification process for, the simulator solution. I therefore conclude that, if there is to be a trial at which such proof is relevant, the certificate of analysis for lot 1027 used in both cases will be admissible.

## DISTRICT ATTORNEY'S ALTERNATIVE POSITION

The District Attorney here and in Rochester offered an alternative or fall-back position that the ampoules need not be tested or certified.[16] This was rejected by the Rochester court and is rejected by me. In a breathalyzer case far more authoritative expert testimony on behalf of the prosecution would be required to permit a court to come to that novel conclusion, which on its face would violate the breathalyzer admissibility requirements of *People v Donaldson* (36 AD2d 37, *supra)* and *People v Freeland* (68 NY2d 699, *supra).* Whether or not the District Attorney might choose to offer additional expert testimony in other pending or future prosecutions presenting the same issue, I will not permit such additional testimony in the two instant actions now before me after ample opportunity was already provided.[17]

## DISTRICT ATTORNEY'S CROSS MOTION

Finally, the District Attorney has cross-moved to preclude the defense from making any use of the Auditor General's report at trial. While far from flawless, the report was partially corroborated by other evidence and it has proven to be a useful source for raising issues further explored during this hearing. Nevertheless, as a trial document (if there is to be a trial involving breathalyzer issues) it falls short of any recognized hearsay exceptions in this State. Even assuming proper authenticity, as an investigative report, filled with opinions and conclusions, it is not a business record within the meaning of the statute and the cases. (CPLR 4518 [a]; *Stevens v*

---

**16.** The Assistant District Attorney argued that if a properly calibrated machine showed a .10% BAC reading for a known simulator solution, as should be the case before every breath test, the chemical composition of the ampoule must be correct. But there is insufficient proof and a lack of expert authority in this record to support such a proposition. Moreover, as Detective Bonamo testified, to conduct a *valid* test both the test ampoule and the reference ampoule must be from the *same* lot. Since I have found that at SII the lot numbering system in 1986 and 1987 was improper, one could never conclude with reasonable scientific certainty that such condition was met for the lots produced during that period.

**17.** The positive experience that New York State and New York City authorities have had with SII's breathalyzer products, however impressive as far as it goes, does not redeem the prosecution's case. Each of them expressed how vital it was to the certification process that each ampoule in a given lot be guaranteed to be homogeneous, which I have concluded cannot be established for SII lots produced in 1986-1987.

*Kirby,* 86 AD2d 391 [4th Dept 1982].)[18] It is also questionable as a public record under CPLR 4520, for similar reasons. *(See,* Richardson, Evidence §§ 342-346 [Prince 10th ed].) In addition, the Auditor General's statutory authority is to audit publicly awarded contracts and public accounts, not to critique scientific laboratory techniques. (Pa Stat Annot, tit 72, §§ 402-405.)[19] Moreover, the report has been rebuffed by the Commonwealth's chief legal officer and has not yet even been endorsed by the newly elected Auditor General. Accordingly, the defense will be barred from offering the document into evidence at these trials. However, any use the defense may seek to make of the factual portions of the document on cross-examination of prosecution witnesses or on the direct examinations of any defense witnesses must necessarily be left to the sound discretion of the Trial Judge.

### CONCLUSION

The SII simulator solution, lot 1027, was properly prepared and its certificate of analysis is competent and admissible. The SII ampoules from lots 0916 in *Hosein* and 0917 in *Serrano* have not been shown to have been properly produced and the certificates of analysis for each lot are incompetent and inadmissible. The motions of defendants Serrano and Hosein are granted and the prosecution is precluded from introducing the results of the breathalyzer tests into evidence at their trials. The cross motion of the District Attorney is also granted to the extent of precluding the defense from introducing the Pennsylvania Auditor General's report as a whole into evidence at trial as a business record under CPLR 4518 or as a public record under CPLR 4520.

[Portions of opinion omitted for purposes of publication.]

---

**18.** The recent United States Supreme Court decision, holding that a Navy *investigative* report was admissible in the trial of a product liability action *(Beech Aircraft Corp. v Rainey,* 488 US —, 102 L Ed 2d 445), has immediate impact only on cases tried under the Federal Rules of Evidence.

**19.** While I do not agree with the District Attorney that the report is totally outside the Auditor General's authority, and I have found it to be a very useful source, I do believe its expansive scope, in addition to its style, renders it unsuitable to be admitted *at trial* as a public record. *(Compare, Kozlowski v City of Amsterdam,* 111 AD2d 476, 478 [3d Dept 1985].)