OPINION OF THE COURT
Harold Beeler, J.
This case is before the court on a motion by defendant to reargue the denial of the motion to suppress the results of a breathalyzer test administered in connection with defendant’s October 1988 arrest for driving while intoxicated (Vehicle and Traffic Law § 1192 [2], [3]) and aggravated unlicensed operation of a motor vehicle in the third degree (Vehicle and Traffic Law § 511 [1]). Defendant claims, in substance, that this court’s original decision, denying his motion to suppress without a hearing on the ground that the integrity of the chemicals used to conduct defendant’s breathalyzer test could not be established, should be reversed in view of subsequent case law generally supportive of defendant’s position (see, People v Serrano, 142 Misc 2d 1087).
In addition, defendant asks the court to consider a second ground for suppression, not addressed in his original papers, to the effect that the standard "conversion ratio” applied by the breathalyzer machine to convert breath alcohol concentration to blood alcohol concentration has been "approximated” for the general population and has not been shown to be applicable to this particular defendant, thus rendering his breathalyzer test result scientifically unreliable.
Defendant’s motion to reargue is granted, but, for the reasons that follow, the court denies in all respects defendant’s motion to suppress.
I. INTEGRITY OF BREATHALYZER CHEMICALS
While the court agrees with defendant that the holding in Serrano (supra) raises serious issues of fact regarding the reliability of the "certificates of analysis” commonly used to satisfy the "chemical integrity” prong of the foundation for admission of breathalyzer test results into evidence (see, Peo *404 ple v Alvarez, 70 NY2d 375, 380; and People v Freeland, 68 NY2d 699, 700), it is this court’s considered opinion that such certificates are not the only scientifically acceptable means of establishing this portion of the required foundation. Accordingly, inasmuch as the People here are prepared to offer, independent of any "certificate of analysis”, evidence sufficient to satisfy the foundational requirements set forth in Alvarez (supra) and Freeland (supra) as to the propriety of the chemicals used in defendant’s breathalyzer test, defendant’s request for relief on this ground must be denied.
In his initial suppression application, defendant argued in substance that the quality and proper composition of the chemical solution used to conduct the breathalyzer test in this case, and to calibrate breathalyzer instruments State-wide, could not be determined as a result of the poor manufacturing, record keeping and quality control procedures employed by Systems Innovation, Inc. (SII), the manufacturer of this chemical solution. In support of his position, defendant relied almost exclusively on portions of a 1987 report issued by the Auditor General of Pennsylvania following an investigation into the manufacturing and quality control practices of this Pennsylvania-based producer of the ampoule and simulator solutions used to conduct breathalyzer tests throughout New York State.
The court denied defendant’s suppression motion, finding the largely unsubstantiated hearsay allegations in the Auditor General’s report that SII had engaged in "lot switching” and other "scientifically [unacceptable” practices insufficient, by themselves, to warrant the relief sought, especially in view of the contrary conclusions reached by the Pennsylvania Attorney General who, "after a thorough investigation”, repudiated as "erroneous and misleading” the Auditor General’s report, and concluded that "there is no reason to believe that the solutions provided by SII [are] defective.” Also relied upon by the court. in denying defendant’s initial application were certain documents proffered by the People to show the integrity of the chemicals used in defendant’s breathalyzer test, including a certified copy of a "certificate of analysis” from the New York State Police laboratory attesting that said chemicals were obtained from "lots” that had been previously sampled, analyzed and found to conform to New York’s "exacting requirements”, as well as affidavits attesting to the over-all integrity of SII’s products based on this State’s independent, "quality control” testing procedures.
*405 Subsequently, defendant sought and was granted permission to reargue the denial of his suppression motion, filing a "supplemental affirmation” in support thereof which, inter alia, directed this court’s attention to the case of People v Serrano (142 Misc 2d 1087, supra), decided shortly after the court filed its original decision herein.
In Serrano (supra) an "extended” pretrial hearing was held in a prosecution under Vehicle and Traffic Law § 1192 to determine the admissibility of certain "certificates of analysis” being offered by the People as part of their foundation for the admission at trial of a defendant’s breathalyzer test results. The focus of this hearing was the probative value, if any, to be assigned these "certificates”, which pertained to simulator and ampoule solutions produced by SII, in light of the allegations of "lot switching” attributed to that company by the Pennsylvania Auditor General. As noted in Serrano, the probative worth of a "certificate of analysis” offered to prove the integrity of the chemical solution used in a particular breathalyzer test would be nil, if, in fact, the chemicals used in that test were not obtained from the exact same batch or "lot” referred to in the proffered certificate.
With this principle in mind, the court in Serrano (supra), relying on, inter alia, transcripts of testimony taken at a similar, though unrelated, upstate proceeding, found the certificates of analysis for two specific SII ampoule lot numbers "not competent” to prove the chemical integrity of the ampoules they purported to represent. Upon so finding, the court precluded the People from introducing into evidence the corresponding breathalyzer test results.
Defendant herein, noting that one of the ampoule lot numbers found "not competent” in Serrano (supra) (i.e., lot number 0917) is the same as that appearing on the certificate of analysis proffered by the People in this case, asks the court to reach the same result arrived at in Serrano and preclude the People from offering his breathalyzer test results into evidence. This the court declines to do.
Concededly, the evidence considered by the court in Serrano (supra), in particular the transcripts of testimony of a former SII employee who was directly involved in the day-to-day production of the ampoule solution at issue herein, raises serious questions, not raised in defendant’s initial moving papers, as to the reliability of SII’s "lot” numbering system. This evidence, to the effect that the ampoule solution pro *406 duced at SII was routinely prepared in small, 5-gallon jugs rather than in much larger 55- (or 350-) gallon "drums”, suggests, and the court in Serrano so found, that the literally thousands of ampoules produced under "lot” number 0917 did not, in fact, come from one homogeneous source, thus undermining the "scientific reliability and probative force” of the certificate of analysis being offered to prove the chemical integrity of the ampoule solution bearing that "lot” number (People v Serrano, supra).
Had the People in the case at bar offered no alternate method of establishing the proper chemical composition of the ampoules used to conduct defendant’s breathalyzer test, this court would likely have granted defendant’s suppression application, at least to the extent of ordering a pretrial hearing to resolve the significant factual questions raised by Serrano (supra).
Where, however, the People have established to this court’s satisfaction their ability to meet the foundational prerequisites for the admission of breathalyzer test results into evidence, independent of the proffered "certificate of analysis”, a pretrial hearing on the scientific reliability of such certificate is, in this court’s view, wholly unwarranted.
The court notes in this regard that the legal standard governing the foundation for the admission into evidence of breathalyzer test results is far from rigorous, and should not be confused with the more onerous burden ultimately required for conviction. As stated in People v Freeland (68 NY2d 699, 700, supra), and later reiterated in People v Alvarez (70 NY2d 375, 380, supra), the People, to satisfy this standard, need only introduce "evidence from which the trier of fact could reasonably conclude, inter alia * * * that the chemicals used in conducting the test were of the proper kind and mixed in the proper proportions” (emphasis added).
The question of whether the trier of fact "could reasonably conclude” that the chemicals used in a particular test were properly prepared is, of course, initially a question of law to be decided by the court. Upon the People’s satisfying this minimal evidentiary threshold, however, the defendant would then be free to reargue this issue before the fact finder in an effort to convince it of the ultimate unreliability or inaccuracy of the results obtained in his particular case (see, California v Trombetta, 467 US 479, 485; and People v Alvarez, supra, at 380).
*407 Further, the court rejects defendant’s contention that the "certificate of analysis” is the "proper” or exclusive method for meeting the foundational requirement at issue herein. The Court of Appeals, in its most recent pronouncement on this question, expressly declined to adopt specific guidelines as to the "nature, quantity and quality of proof * * * required to establish th[e] foundational requirements” for the admission of breathalyzer test results into evidence (People v Freeland, supra, at 701). As such, the fact that a particular method of proof (i.e., the certificate of analysis) has been routinely used in this and other jurisdictions to satisfy the "chemical integrity” prong of the foundation should not deter this court from accepting any other scientifically reliable means of proving the propriety of the chemicals used in a particular breathalyzer test.
The People in this case are prepared to offer at trial, in addition to the arguably suspect "certificate of analysis”, independent evidence that the breathalyzer machine itself is essentially "foolproof’ in its ability to alert the breathalyzer operator to the fact that "bad” ampoule or simulator solution has been used in a given breathalyzer test. This evidence, in the form of "expert” testimony, would, according to the People’s responding papers, show: (1) that the chances of defective or improperly prepared ampoule or simulator solution going undetected in a properly administered breathalyzer test are "infinitesimal”, and (2) that "the validity of any breathalyzer examination can be established without the use of certificates [of analysis]” through properly conducted "simulator” tests performed in conjunction with the test on defendant’s breath sample (emphasis added).
In evaluating the probative value of this proffered testimony, the court notes that the purported capability of the breathalyzer machine to independently provide "almost incontrovertible proof not only that the chemicals are proper but that the instrument is in working order”, has been recognized for over two decades (see, Watts, Some Observations On Police-Administered Tests For Intoxication, 45 NC L Rev 34, 86-88 [1966]), and is based, in large part, on the fact that the exact same ampoule used to test a defendant’s breath can, at the time of the defendant’s test, be exposed to a known concentration of alcohol in water (i.e., simulator solution) to ascertain if the test ampoule is properly composed. As noted by one of the People’s experts, for an improper simulator or ampoule solution to evade detection by a properly trained breathalyzer *408 operator during a simulator "run” of a defendant’s test ampoule not only would both the simulator solution and the ampoule solution have to be defective, but both would have to vary from the required norm to the exact same degree, a scenario which, "as a practical matter * * * cannot happen.”
Viewed in its entirety, the evidence proffered by the People, including the previously submitted affidavits attesting to the demonstrated integrity of SII’s chemical products, appears more than sufficient to satisfy the admissibility standard of "evidence from which the trier of fact could reasonably conclude” that the chemicals used in defendant’s breathalyzer test were proper (see, People v Alvarez, 70 NY2d 375, 380, supra; and People v Freeland, 68 NY2d 699, 700, supra). This is true, moreover, notwithstanding the distinct possibility that the ultimate arbiter of this question of law, the Trial Judge, may assess little or no probative value to the aforementioned "certificate of analysis” as a result of the legitimate questions of reliability raised in People v Serrano (142 Misc 2d 1087, supra).
This court is aware of the potential prejudice to a defendant encountered when the People, in a prosecution involving a breathalyzer test, are allowed to refer to the defendant’s test result in their opening statement, only to have the result subsequently excluded from evidence for failure to meet the required foundation (see, People v Pantaleo, 141 Misc 2d 251, 256). In this regard, a pretrial "suppression” hearing on the admissibility of these test results, though not specifically authorized by the Criminal Procedure Law (see, CPL 710.20), would obviously go far toward averting any such prejudice (see, People v Pantaleo, supra).
In a case such as the one at bar, however, where the People have demonstrated a strong likelihood of being able to satisfy the "chemical integrity” facet of the evidentiary foundation for admission of breathalyzer test results into evidence, a pretrial hearing on this question is not only unwarranted, but would amount to a significant waste of both judicial and prosecutorial resources by requiring the People to, in effect, lay their evidentiary foundation twice.
Accordingly, for all the aforesaid reasons, defendant’s suppression motion on the ground and his request for a pretrial hearing thereon are, in all respects, denied.
II. blood/breath conversion ratio
Defendant also moves to suppress his breathalyzer test *409 result on the ground that said result is scientifically unreliable in that it was arrived at using a "conversion ratio” for determining blood alcohol concentration which has not been shown to be applicable to this particular defendant. For the reasons that follow, defendant’s motion to suppress on this ground is denied.
It is recognized that the breathalyzer operates on the assumption that "at normal body temperature the concentration of alcohol in the blood circulating through the lungs is 2,100 times greater than [that] in the air discharged from the lungs” (People v Donaldson, 36 AD2d 37, 39). Thus, when an individual supplies a breath sample for analysis, the breathalyzer automatically converts the figure for concentration of alcohol in the breath into a blood alcohol reading using a fixed "conversion” ratio of 2,100 to 1.
As conceded by the People, however, it is also widely accepted among authorities in this field that the ratio of 2,100 to 1 is a statistical "mean” and that the actual blood/breath conversion ratio applicable to the population-at-large, and to any one person, varies depending upon, among other things, the unique body chemistry of each individual.
Defendant here claims, in substance, that since there is "no evidence” that his conversion ratio is actually 2,100 to 1, his breathalyzer test result, which was necessarily obtained by application of this fixed ratio, is scientifically unreliable and should therefore be suppressed. The court does not agree.
The court notes in this regard that the People, in response to defendant’s motion, have provided persuasive documentary evidence, which suggests, inter alia, that: (1) the breathalyzer, by using a conversion ratio of 2,100 to 1 rather than a ratio of 2,300 to 1, which more accurately reflects the true "mean” blood/breath ratio for the general population, actually underestimates the blood alcohol concentration for the "vast majority” of individuals tested; (2) in the very small percentage of cases (approximately 5%) where a breath test result has been found to be higher than an individual’s actual blood alcohol concentration, the maximum deviation between the results is less than .03%; and (3) even considering the fact that a certain percentage of the population 4 may have conversion ratios below 2,100 to 1, there is an extremely high likelihood that a person with a breathalyzer result of .13 or above has an actual blood alcohol concentration greater than .10, and this likelihood increases as the breathalyzer reading increases.
*410 Had defendant in this case proffered at least some evidence to suggest that his own blood/breath ratio is unusually low, either generally, or at the time the breathalyzer test herein was performed, or had defendant’s breathalyzer reading been considerably lower than his alleged reading of .17, this court might find merit to defendant’s suppression application. On this record, however, defendant has presented nothing to justify either suppression or a pretrial hearing on the reliability of his breathalyzer result (see, People v Garneau, 120 AD2d 112, 114).
Rather, the questions raised by defendant concerning blood/ breath ratio are properly questions that go to the weight to be afforded defendant’s breathalyzer test result, not its admissibility. This conclusion, moreover, is in accord with the vast majority of cases, both here and in other States, that have considered this issue (see, People v Amores, NYLJ, May 4, 1989, at 26, col 2 [Crim Ct, Bronx County]; People v Brown, 143 Misc 2d 270; People v McDonald, 206 Cal App 3d 877, 254 Cal Rptr 384 [1988]; State v Babcock, 227 Neb 649, 419 NW2d 527 [1988]; State v Hvistendahl, 225 Neb 315, 405 NW2d 273, 275-276 [1987]).
For all the aforesaid reasons, defendant’s application for relief on this ground is, in all respects, denied.