THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RICKY D. URUBURU, Appellant.

Fourth Department, June 7, 1991

APPEARANCES OF COUNSEL

*Edward Fiandach* for appellant.

*Howard R. Relin, District Attorney (Elizabeth Clifford* of counsel), for respondent

## OPINION OF THE COURT

DENMAN, J.

■ Defendant appeals from his conviction, following a bench trial, of felony driving while intoxicated (blood alcohol content of .10% [Vehicle and Traffic Law § 1192 (2)]) and driving while ability impaired (Vehicle and Traffic Law § 1192 [1]). Defendant contends that the People failed to lay an adequate foundation for the admission into evidence of the breathalyzer test result because they failed to show that the chemicals were "of the proper kind and mixed in the proper proportions" *(see, e.g., People v Freeland,* 68 NY2d 699, 700). Defen-

dant thus contends that the breathalyzer result should have been excluded, and that, without it, the evidence is insufficient to support his DWI conviction. We conclude that defendant's proof so undermined the People's foundational evidence that the breathalyzer result should not have been admitted. Consequently, we find the evidence against defendant insufficient to support his DWI conviction.

Defendant initially was charged with two counts of felony driving while intoxicated (Vehicle and Traffic Law § 1192 [2], [3]) and speeding. The trial evidence established that, after becoming involved in a minor accident on May 28, 1989, defendant was arrested by a Town of Greece police officer for driving while intoxicated. A breathalyzer test was administered in accordance with the usual procedures. A sulphuric acid solution ampoule designated lot No. 1038 was inserted into the machine and defendant's breath was tested, yielding a result of .17. Subsequently, a "simulator" solution with a known value of .10 was placed in the machine, and a second test yielded a reading of .09.

The People attempted to establish a foundation for admission of the breathalyzer test result in the usual manner. They introduced the Town of Greece weekly breathalyzer calibration/test record for the machine in question. That document showed that, over the first six months of 1989, the machine had been tested 81 times using simulator solutions bearing varying lot numbers and sulphuric acid solutions primarily bearing the lot No. 1038; in each instance, the calibration check yielded a result of .10. They also introduced a State Division of Criminal Justice Services certificate of machine calibration, dated January 18, 1989; a State Division of Criminal Justice Services certificate of machine calibration, dated September 29, 1988; a State Police crime laboratory certificate of analysis, dated December 12, 1988, for sulphuric acid solution ampoules control No. 1038 (People's exhibit 4); a State Police crime laboratory certificate of analysis, dated February 2, 1989, for simulator solution lot No. 0229; a Town of Greece breathalyzer checklist pertaining to defendant's arrest; and a Monroe County Public Safety laboratory certificate of machine calibration, dated June 16, 1989.

Defense counsel objected to the admission of exhibit 4 and the test result and challenged the methods of Systems Innovation, Inc. (SII), the Pennsylvania company that manufactures the sulphuric acid solution ampoules certified by exhibit 4 and used in defendant's breath test. Defense counsel made an offer

of proof concerning the unscientific lot numbering practices of SII. The court received exhibit 4 in evidence, but admitted the breathalyzer test result on a preliminary basis only, subject to later defense motion or argument to strike or disregard those results in the event that the defense proof undermined the accuracy of the breathalyzer by impugning the integrity of the sulphuric acid solution used in the test.

The defense called Leroy Campbell, a former employee of SII at its Hallstead, Pennsylvania plant. The thrust of Campbell's testimony was that the sulphuric acid solution ampoules manufactured by SII were labeled by lot numbers that did not correspond to the actual batches of such solution; in many cases, different batches were assigned a single lot number, and in some cases, more than one lot number was assigned to ampoules from a single batch. The implication of Campbell's testimony was that, because of the lack of correlation between the lot numbers on the ampoules and the distinct batches actually manufactured by the company, random testing by the State of ampoules bearing a certain lot number did not assure the proper composition of all ampoules bearing that lot number.

Campbell testified that he worked at SII, which is a small operation, between September 1986 and October 1987 (about a year and one half before defendant's arrest). His responsibilities included production of sulphuric acid solution ampoules, and in some instances, the mixing of the solution itself. He also observed his superiors mix the sulphuric acid solution. The solution was always mixed in five-gallon containers, of which the company had 5 or 6. The company had larger containers on the premises, but those were used for other purposes. The ampoules were filled directly from the five-gallon containers of solution; each jug could fill approximately 5,000 ampoules. After the ampoules were filled and sealed, a lot number was silk-screened and baked onto the ampoules. They were then packaged and sent either to police labs (e.g., New York State's) or independent labs for testing, and then to law enforcement authorities all over the country.

During Campbell's tenure, the company produced ampoules bearing four different lot numbers: 0916, 0217, 0617 and, just as Campbell left the company, 0917. Campbell knew nothing about lot No. 1038. The numbering system generally was coded to the month and year in which the company first assigned that number. For example, lot No. 0217 was assigned to a production run that commenced in February 1987. A

given lot number was assigned to ampoules that were in fact mixed in different batches, i.e., in different five-gallon jugs. When one jug of solution ran out, a new one would be mixed, but generally a new number would not be assigned. The contents of different batches would be commingled only to the extent that the solution at the bottom of the old batch (which the ampoule-filling machine would not reach) would be poured into the new batch. To the best of Campbell's recollection, ampoules bearing lot No. 0916 in fact contained solution from approximately 50 to 65 different batches; about 35 to 40 different batches went into lot No. 0217; and 2 or 3 batches comprised lot No. 0617. Moreover, Campbell testified that lot No. 0617 was invented in response to questions from law enforcement authorities concerning the integrity of lot No. 0217. The company drew ampoules from different batches that otherwise would have been labeled 0217, labeled them 0617, and sent them out for certification. The defense admitted photographs into evidence depicting SII's premises.

The court ultimately ruled that the breathalyzer test result was admissible and relied on it to convict defendant of driving with a blood alcohol content in excess of .10%. The court acquitted defendant of common-law driving while intoxicated, convicted him of the lesser included offense of driving while ability impaired, and acquitted him of speeding.

We conclude that the breathalyzer test result was improperly admitted into evidence. When a breathalyzer test is sought to be used against defendant at trial, the People must establish that the testing device was in proper working order at the time the test was administered, that the test was properly administered, and that "the chemicals used in conducting the test were of the proper kind and mixed in the proper proportions" *(see, People v Freeland,* 68 NY2d 699, 700, *supra; People v Campbell,* 73 NY2d 481, 484; *People v Alvarez,* 70 NY2d 375, 380; *People v Mertz,* 68 NY2d 136, 148; *People v Donaldson,* 36 AD2d 37, 41). The People's obligation to establish the foregoing goes to the admissibility of the breathalyzer test result, not merely to the weight to be accorded it *(People v Freeland, supra,* at 700-701; *People v Mertz, supra; People v Garneau,* 120 AD2d 112, 115, *lv denied* 69 NY2d 880). The instant case concerns the sufficiency of the People's foundational evidence to meet the last of the aforementioned requirements, i.e., to show that the chemicals used in the test were of the proper kind and mixed in the proper proportions *(see, People v Garneau, supra,* at 114-115). We are particularly

concerned with the sufficiency of the People's evidence to show the proper composition of the sulphuric acid solution ampoules utilized in the testing of defendant's breath, in the ensuing "simulator" test designed to assure the correctness of the breath test, and in the weekly series of "calibration" checks designed to assure the proper operation of the machine itself.

The courts have long noted and generally approved of the People's reliance upon authenticating certificates of government or independent laboratories to show the proper composition of chemical ampoules used in breathalyzer tests *(see, People v Kinne,* 71 NY2d 879, 880; *People v Freeland, supra; People v Gower,* 42 NY2d 117, 122; *People v McDonough,* 132 AD2d 997, 998, *lv denied* 70 NY2d 801; *People v Garneau, supra; People v Meikrantz,* 77 Misc 2d 892, 897-901). In this case, the People, following the standard practice, introduced a State Police laboratory certificate of analysis for the purpose of showing that the sulphuric acid solution ampoule used in defendant's test was properly constituted. People's exhibit 4, entitled "Record of Analysis Breath Analyzer Ampoules", states that tests had been performed upon ampoules control No. 1038 supplied by SII and that the chemical composition of those ampoules was within specifications. Defendant challenges the logical probativeness, and hence the legal sufficiency, of that authenticating certificate to demonstrate the proper composition of the sulphuric acid solution used in this case.

We conclude that Campbell's testimony relating the manufacturer's irregular lot numbering practice negated the probativeness of the authenticating certificate and therefore rendered the foundational evidence insufficient to support the admission of the breathalyzer test result. The State Police lab, in certifying the integrity of the sulphuric acid solution of a given lot number, obviously does not analyze every ampoule in that lot *(see, State v Maure,* 240 NJ Super 269, 280, 573 A2d 186, 192, *affd* 123 NJ 457, 588 A2d 383). The manufacturer sends (or is supposed to send) random samples bearing a given lot number, which the lab then analyzes in order to certify their proper composition. The reliability of random sampling to show the proper composition of all ampoules bearing that lot number depends absolutely on the representative character of the samples, which in turn depends upon all ampoules of a given lot number having been produced in a single batch mixed in a single container at the same time *(People v*

*Serrano,* 142 Misc 2d 1087, 1093-1096; *see, People v Meikrantz, supra,* at 899; *see also, State v Maure, supra,* 240 NJ Super, at 280-282). Thus, the probative value of the random sampling rests upon the assumption that the samples of all other ampoules bearing that lot number come from a single homogeneous batch of solution, and that no other batch bears that same lot number *(see, State v Maure, supra,* 240 NJ Super, at 282; *State v Dohme,* 229 NJ Super 49, 52-53, 550 A2d 1232, 1234).

Campbell's unrefuted testimony destroyed that assumption. He testified that the sulphuric acid solution ampoules manufactured by SII were labeled by lot numbers that did not correspond to the actual batches of such solution, and that many different batches were assigned a single lot number. Because of the lack of correlation between the lot numbers on the ampoules and the distinct batches actually manufactured by SII, there is no basis for assuming that the lot numbers designated uniform solutions. Consequently, random testing of ampoules bearing a given lot number did not assure the proper composition of all ampoules bearing that lot number. Inasmuch as the samples tested were not representative, the laboratory certificate relied upon by the People lacked probative value to show the proper composition of the sulphuric acid solution ampoules used in defendant's test and, indeed, those used to check calibration of the machine itself. "Thus, in the absence of any evidence from which the trier of fact could reasonably conclude that the test results were derived from a properly functioning machine using properly constituted chemicals, it was error to admit the test results" *(People v Freeland, supra,* at 701; *see, People v Mertz, supra; People v Garneau, supra; People v Schneider,* 129 Misc 2d 674, 677-678).

It is no answer to defendant's contention to argue, as the People do, that Campbell's testimony related only to lot Nos. 0916, 0217 and 0617, and did not relate specifically to the integrity of lot No. 1038, the ampoules used by the police in this case. Campbell's testimony broadly impugned the reliability of SII's lot numbering practices throughout his tenure with the firm. On the basis of that testimony, and particularly in the absence of any proof by the People that SII's practices have changed since October 1987, we are compelled by the presumption of continuity to conclude that SII's unscientific methods persisted through October 1988, when it began manufacturing ampoules bearing lot No. 1038. Moreover, we note that, in January 1989, when the State Police had last cali-

brated this breathalyzer machine, they used a sulphuric acid solution ampoule bearing the lot No. 0617, the one described by Campbell as composed of ampoules taken from different batches of solution.

We agree with the many trial court decisions, both reported and unreported, holding or assuming that proof of SII's unscientific numbering practices renders the laboratory certificates incompetent and irrelevant to prove the chemical composition of the ampoules *(see, People v Ruiz,* 146 Misc 2d 825, 827; *People v Serrano, supra; People v Pantaleo [Pantaleo II],* NYLJ, Sept. 20, 1989, at 22, col 4; *People v Simpson,* Watertown City Ct, Mar. 27, 1990; *People v Bird,* Tonawanda City Ct, Sept. 11, 1989, index No. 88-3045; *see also, People v Singh,* 144 Misc 2d 402, 405-406; *People v Nieves,* 143 Misc 2d 734, 741; *People v Pantaleo [Pantaleo I],* 141 Misc 2d 251).* We also agree with those courts that have held that, without other evidence establishing the proper composition of the ampoules, the lack of competent certification renders the breathalyzer test inadmissible *(see, People v Ruiz, supra,* at 827-828; *People v Serrano, supra; People v Simpson, supra; People v Bird, supra; cf., People v Freeland,* 68 NY2d 699, *supra; People v Mertz,* 68 NY2d 136, *supra; People v Garneau,* 120 AD2d 112, *supra).* We disagree with a contrary decision in *People v Sherwood* (160 AD2d 1203, *lv denied* 76 NY2d 796), which rests upon an inaccurate and incomplete interpretation of the basis for the decision in *Serrano (supra),* and which, in our view, takes an unjustifiably relaxed view of the foundational requirements in breathalyzer cases. Further, the *Sherwood* decision is dictum because the defendant there failed to preserve the *Serrano* issue for review and evidently failed to make an adequate record to support his challenge to the admissibility of the breathalyzer result.

■ The erroneous admission of the breathalyzer result led directly to defendant's conviction under Vehicle and Traffic Law § 1192 (2), and the judgment therefore should be modified to reverse that conviction. Without the breathalyzer result, there is no evidence in the record to support a conviction under Vehicle and Traffic Law § 1192 (2), and that charge thus should be dismissed. In view of the other evidence tending to

---

* The trial court cases almost uniformly address this issue within the context of a pretrial motion to exclude the breathalyzer result for lack of reliability, and there is a wide divergence of authority concerning whether a pretrial motion properly lies. In the circumstances of this case, we need not pass on that issue.

show defendant's intoxication, however, the conviction of driving while impaired is not affected by the error and can stand.

Accordingly, the judgment appealed from should be modified to reverse defendant's conviction under Vehicle and Traffic Law § 1192 (2) and to dismiss that count of the indictment. Otherwise, the judgment should be affirmed.

DILLON, P. J., LAWTON, LOWERY and DAVIS, JJ., concur.

Judgment unanimously modified, on the law, and, as modified, affirmed, in accordance with the opinion by DENMAN, J.